**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: 310-405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFF TYLER, Individually and on Behalf of All Others Similarly Situated,<br><br>                                    Plaintiff,<br><br>     vs.<br><br>CANOO INC., TONY AQUILA, ULRICH KRANZ, and PAUL BALCIUNAS,<br><br>                                    Defendants. | Case No.:<br><br>CLASS ACTION<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# INTRODUCTION

Plaintiff, by his undersigned attorneys, alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the public documents and announcements issued by Canoo Inc. ("Canoo" or the "Company"), filings with the U.S. Securities and Exchange Commission ("SEC"), wire and press releases published by and regarding the Company, securities analysts' reports and advisories about the Company, and other information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.    This is a federal class action brought individually and on behalf of all other persons and entities who purchased or otherwise acquired publicly-traded Canoo common stock and/or warrants from August 18, 2020, through and including March 29, 2021, (the "Class Period"), seeking to recover damages pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder (the "Class").

## JURISDICTION AND VENUE

2.    The claims alleged herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), as a substantial part of the acts events or omissions giving rise to the claims pleaded herein occurred in this District and defendants named herein maintain their residence or principal places of business in this District.

5.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the NASDAQ National Securities Market ("NASDAQ").

## PARTIES

6.     Plaintiff purchased shares of Canoo common stock, as set forth in the accompanying certification, which is incorporated by reference herein, and has been damaged thereby.

7.     Canoo (formerly known as Hennessy Capital Acquisition Corp. IV) is a Delaware corporation and maintains its principal executive offices in 19951 Mariner Avenue, Torrance, California.  The Company was incorporated in Delaware on August 6, 2018 and conducted its initial public offering in March 2019.  The Company was formed for the purpose of effecting a business combination with specific focus on businesses in the industrial, technology and infrastructure sectors.  Such companies are

referred to as "blank check" companies or special purpose acquisition companies ("SPACs"). In December 2020, the Company entered into a business combination with Canoo Holdings Limited (the "Business Combination"). The combined company purports to be a mobility technology company that develops electric vehicles ("EV"). The Company's common stock and warrants are listed on the NASDAQ under the ticker symbol "GOEV" and "GOEVW," respectively. Prior to December 22, 2020, the Company's common stock and warrants traded under the symbols "HCAC" and "HCACW," respectively.

8. Defendant Ulrich Kranz ("Kranz") served as Co-Founder and Chief Executive Officer ("CEO") of Canoo Holdings Limited until he became the Company's CEO, In Charge after the Business Combination.

9. Defendant Paul Balciunas ("Balciunas") served as Canoo Holdings Limited's In Charge of Finance (CFO) & Corporate Development until he became Chief Financial Officer ("CFO") In Charge of Finance after the Business Combination. On March 29, 2021, the Company announced that Balciunas would be resigning from the Company effective April 2, 2021. Balciunas signed the Company's Annual Report for the fiscal year ended December 31, 2020 filed on Form 10-K with the SEC on March 31, 2021 ("FY 2020 10-K") as the Company's "Principal Financial Officer and Principal Accounting Officer."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

10.     Defendant Anthony (Tony) Aquila ("Aquila") began serving as Executive Chairman and Director after the Business Combination.  Aquila signed the FY 2020 10-K as the Company's "Principal Executive Officer."

11.     Defendants Kranz, Balciunas and Aquila are collectively referred to herein as the "Individual Defendants."

12.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  By reason of their management positions and their ability to make public statements in the name of Canoo, the Individual Defendants were and are controlling persons, and had the power and influence to cause (and did cause) Canoo to engage in the conduct complained of herein.

## CLASS ACTION ALLEGATIONS

13.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all those who purchased or otherwise acquired publicly traded Canoo common stock and/or warrants from August 18, 2020, through and including March 29, 2021.  Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

14.     The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Canoo common stock and warrants were actively traded on the NASDAQ. Although the exact number of Class members is unknown at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members of the Class who traded the Company's common stock and warrants during the Class Period.

15.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

> (a)     Whether Defendants violated federal securities laws based upon the facts alleged herein;

> (b)     Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management;

> (c)     Whether the Individual Defendants caused Canoo to issue false and misleading statements during the Class Period;

> (d)     Whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(e)    Whether the prices of Canoo common stock and warrants during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

16.   Plaintiff's claims are typical of the claims of the members of the Class as Plaintiff and members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal laws as complained of herein.

17.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

18.   A class action is superior to alternative methods for the fair and efficient adjudication of this controversy since joinder of all members of this Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

19.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(b) the omissions and misrepresentations were material;

(c) Canoo common stock and warrants are traded in an efficient market;

(d) the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on the NASDAQ and was covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(g) Plaintiff and members of the Class purchased, acquired and/or sold Canoo securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

20. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## <u>MATERIALLY FALSE & MISLEADING STATEMENTS</u>

21. The Class Period begins on August 18, 2020. On August 18, 2020, the Company issued a press release announcing that it had entered into a deal with Canoo Holdings Ltd. which would result in it becoming a publicly listed company.

22. During an August 18, 2020 conference call with investors, Defendant Kranz touted three streams of revenue for the Company. In addition to business to business ("B2B") sales, the Company touted its engineering services business and a subscription-based consumer vehicle service business:

We have three phases of revenue streams. **In the first phase, we call it Engineering Services. This is a phase that already exists today. So, we**

7

**are working for companies and we are already making money with the first revenue stream**. The second revenue stream is a B2C. This is a stream that we will have available when we launch our first vehicle, our lifestyle vehicle, by 2022. **This is a consumer vehicle and it will be on subscription**. The B2B service, that you see on the right side, is our third revenue stream. This will be a vehicle introduced in 2023, what we call a last-mile delivery vehicle, and this will be for sales. Three different revenue streams give us very good flexibility, and it makes also sure that we can really tap into different areas to be profitable.

23.     In a presentation filed with the SEC on August 18, 2020, the Company described these streams of revenue as follows:



24.     In another slide the Company touted how its engineering services revenue would "reduce the Company's overall execution risk":

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

25.     Also, during the August 18, 2020 conference call, Defendant Balciunas touted the subscription-based business model:

> Looking at our margin, **our target rate is approximately 40% for the subscription business.** As we look at other competitors that offer subscription products in the technology sector, we see that this margin is very similar and there's a lot of similarities between our model and their model, even though at initial glance it may appear to be very different.… Because depreciation is such a fundamental part of our business, think about it like a rental car business, **for us to be able to achieve a 20% operating profit is far greater than what you see in the traditional automotive OEM business model where that margin is closer to 5% to 10%. So, it really does highlight the power of a subscription business model with this figure being a fully-burdened margin.**

26.     The presentation highlighted how the subscription model was superior to leasing:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS



27.    The presentation further touted how the subscription-based model would be "more profitable & resilient":



CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

28.     On December 21, 2020, Company announced its business combination with Canoo Holdings Ltd. had been completed and that the combined company's common stock and warrants would trade on the NASDAQ beginning on December 22, 2020.

29.     On December 21, 2020, after the market closed, the Company filed a Form 8-K with the SEC signed by Defendant Balciunas.   The Form 8-K included a press release touting the combination and the Company's "unique business model":

> Canoo is a Los Angeles-based company that has developed breakthrough electric vehicles that are reinventing the automotive landscape with bold innovations in design, pioneering technologies, and **a unique business model that defies traditional ownership to put customers first.**

30.     On January 13, 2021, after the market closed, the Company filed a Form 8-K with the SEC with a press release announcing the Company's new Board of Directors. Defendant Balciunas signed the Form 8-K.   Again, the Form 8-K included a press release in which the Company touted its "unique business model":

> Canoo is a Los Angeles-based company that has developed breakthrough electric vehicles that are reinventing the automotive landscape with bold innovations in design, pioneering technologies, and **a unique business model that defies traditional ownership to put customers first.**

31.     A Form S-1 Registration Statement was filed on January 13, 2021 and signed by Defendants Aquila and Balciunas (the "S-1").

32.     In the S-1, the Company touted the value of its EV engineering experience, its deal with Hyundai to provide engineering services, and discussions with other industry participants:

> **This experience and advanced progress have garnered the attention of prospective collaboration partners, including leading global automotive**

**OEMs.** In February 2020, we entered into an agreement with Hyundai Motor Group to co-develop a future EV platform based on our modular and scalable skateboard technology, providing further validation of our technical leadership. The agreement provides for the co-development of a platform for a small segment electric vehicle for which the intellectual property developed will be jointly owned by us and Hyundai Motor Group. The agreement provides that it may be terminated for convenience by either party; however, certain provisions, including with respect to the joint-ownership of intellectual property, survive any such termination. We are also currently in discussions with multiple other blue-chip industry participants interested in leveraging our technologies and engineering expertise for their own commercial products.

33.     The S-1 also stated:

Our pipeline for engineering services includes EV concept design and engineering services for other OEMs, autonomous driving strategics and high growth technology companies. **There is a significant market for contract engineering services among legacy OEMs who lack the expertise to develop an electric powertrain at the pace needed to capitalize on the rising regulatory requirements and global demand for EVs. We are at a distinct competitive advantage to capitalize on this growing demand.** In fact, whereas other new EV entrants are forced to license key technologies and/or outsource primary engineering development to larger OEMs, **we have already received significant OEM interest in our skateboard technology and our team's expertise in platform engineering, powertrains and vehicle design, as is exemplified by the announcement of an agreement between us and Hyundai Motor Group for the co-development of a future EV platform based on our modular skateboard technology.**

Contract engineering opportunities serve as concrete points of external validation for our technology and the talent of our team, as well as **provide additional sources of revenue and long-term commercial opportunities** (such as skateboard and technology licensing) as the relationship matures. **We are also in discussions with a number of other partners and expect to be in a position to announce many more partnerships in due course.**

34.     The S-1 further touted its "innovative" business model:

Both our Lifestyle Vehicle and our Sport Vehicle are initially intended to be made available to consumers via an **innovative subscription business**

**model.** With a single monthly payment, customers will enjoy the benefits of an all-inclusive experience that, in addition to their own vehicle, also includes standard maintenance, warranty, registration and access to both insurance and vehicle charging. We plan to utilize an asset-light, flexible manufacturing strategy by outsourcing our direct vehicle production operations to a world-class vehicle contract manufacturing partner for our initial vehicle programs. In doing so, we will significantly reduce our up-front capital investment and eliminate the recurring fixed costs and overhead that would be required for us to own and operate our own assembly facility.

35.    The S-1 further stated:

Both our Lifestyle Vehicle and our Sport Vehicle are initially intended to be made available to consumers via an innovative subscription business model. Research from Volvo and the Harris Poll shows that 74% of drivers believe EVs are the future of driving, but many are concerned about trying a new technology. 40% of non-EV drivers responded that a 30 day "try before you buy" period would increase the likelihood of them purchasing an EV. In other words, consumers are increasingly interested in EV technology, but long-term commitments (or other hurdles like sizable down payments) remain a significant barrier to entry. **By reducing the commitment required for a typical car purchase or lease, we believe the subscription model will help reduce the barriers to entry for consumers looking to drive an EV, while also providing us with a distinct opportunity for recurring revenue and a unique profit margin profile. We believe this model is supported by a number of key trends in consumer preferences and strong underlying financial metrics as compared to a traditional one-time sale model.**

\* \* \*

During 2020, our revenue has been derived from the provision of engineering, development and design consulting services on a project basis. Once we reach commercialization and commence production of our EVs, **we expect that the significant majority of our revenue will be derived from our consumer subscription program** for our Lifestyle Vehicle and Sport Vehicle, as well as sales of our Multi-Purpose Delivery Vehicle.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

36.     On March 11, 2021, the Company filed a Form 8-K signed by Defendant Balciunas with an attached press release dated March 10, 2021 announcing the debut of a fully-electric pickup truck.  The press release further again touted its business model:

> Canoo is a Los Angeles-based company that has developed breakthrough electric vehicles that are reinventing the automotive landscape with bold innovations in design, pioneering technologies, and **a unique business model that defies traditional ownership to put customers first.**

37.     On March 15, 2021, the Company filed a Form 8-K signed by Defendant Balciunas with an attached press release dated March 15, 2021 in which the Company touted its "unique business model":

> Canoo is a Los Angeles-based company that has developed breakthrough electric vehicles that are reinventing the automotive landscape with bold innovations in design, pioneering technologies, and **a unique business model that defies traditional ownership to put customers first.**

38.     The statements described above were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  As discussed below, the Defendants misled investors by misrepresenting and/or failing to disclose that: (i) the Company's engineering services was not a viable business, would not provide meaningful revenue in 2021, and would not reduce operational risk; (ii) that the Company would no longer be focused on its subscription-based business model; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

## **THE TRUTH EMERGES**

39.     On March 29, 2021, after the market closed, Canoo issued a press release ("Q4 Release") reporting its fourth quarter and full year 2020 results.  The Q4 Release removed the language touting its "unique business model" simply stating: "Canoo has developed breakthrough electric vehicles that are reinventing the automotive landscape with bold innovations in design and pioneering technologies."

40.     On March 29, 2021, the Company held a conference call to discuss its financial results (the "Q4 Call").  During the call Defendant Aquila announced that Defendant Balciunas was being replaced as CFO.  The Company's CEO, Defendant Kranz, was not on the call.

41.     During the Q4 Call, Defendant Aquila revealed that "it was decided by our Board to de-emphasize the originally stated contract engineering services line."

42.     An analyst from ROTH Capital stated during the Q4 Call, "I would acknowledge that these are significant surprises on the call today, and that's not ideal after a SPAC – the IPO process" and asked why the Company "would deemphasize engineering given that the original story was it would subsidize the development and broaden the partner opportunity with potentially multiple hats under license?" Defendant Aquila replied, "I would say that from a Company perspective, it was a contradiction…. [C]ontract engineering house is just really not going to drive the best shareholder value."

43.     Another analyst inquired: "[D]uring the course of the year, you stated a couple of times that you had under discussion with some OEMs and possibly the contract manufacturers. You said that there are going to be some announcements by the end of Q4. I'm just wondering what happened that changed all that?"   To which, Defendant Aquila responded:

> I think that [other Canoo management] were focused on maybe a little more aggressive than I would be in their statements. I think more maturity of this team would not be that presumptuous. We only announce what is contracted. But yes, I think they had the opportunities but they weren't at our standard of representation to the public markets…. And then with respect to contract manufacturing, again we wouldn't make an announcement. Again, this comes back to having an experienced public company team here to be careful of the statements you make. So again, I think it was a little premature deal.

44.     Regarding the subscription model, another analyst asked, "I mean you've tweaked the business model a little bit. But I mean, just curious on the sort of retail to the consumer side, how you're thinking about that going forward? Is there just too much opportunity on the commercial side and you're kind of putting that sort of back burner or is this subscription model still in play? Because I know that was part of the story before." To which Defendant Aquila responded:

> If you think about a membership model, when I came in and took my role and we spent a lot of money analyzing the weight that this will have on the balance sheet…. [S]o you can only have a certain percentage of your business on membership. Otherwise you've got a big cash hit that starts to develop on you, as you can probably imagine. So we'll be doing that on an appropriate basis…. [A]s you can see the modifications we're doing. And to your point, when you really think about it on a financial burden basis on the balance sheet, yes there's probably 80% change but it's too [SIC] that mathematical positive. As far as the sequence of changing the things we're really on the top hat side, which is less right here in the 20% to 40% range.

16

So I like the model, I believe in the model. I know the model. It holds up mathematically and we'll walk you through this. And again, I apologize to anybody. As a leader, you always own the past before the present or the future. And so I take everyone's comments in all the three categories

45.     An article published by *The Verge* shortly after the call reported:

**The deal between Canoo and Hyundai to build electric vehicles appears to be dead, as the California EV startup is moving away from trying to sell its electric vehicle technology to other automakers.**

Canoo chairman Tony Aquila shared the news Monday during an icy investor call—Canoo's first as a publicly-traded company. **Canoo's CEO was also absent from the call, and the company announced earlier in the day that its CFO had resigned to take another job—the second major departure in recent weeks following Canoo losing its head of corporate strategy.**

* * *

"These are significant surprises on the call today, and that's not ideal," Roth Capital analyst Craig Irwin said at one point on the call.

The deal with Hyundai was announced in February 2020, and it was supposed to result in both the Hyundai and Kia brands building vehicles on Canoo's electric vehicle platform. It was seen as a major vote of confidence in the startup, which was just two years old at the time, as well as its tech. Canoo called it a "key partnership." Hyundai did not immediately respond to a request for comment. Canoo did not respond beyond Aquila's statements.

* * *

In documents filed with the Securities and Exchange Commission, both before and after the merger, Canoo had said its planned engineering services business presented "a significant market for contract engineering services among legacy OEMs who lack the expertise to develop an electric powertrain at the pace needed to capitalize on the rising regulatory requirements and global demand for EVs."

* * *

**But on Monday, Aquila said Canoo will now focus more on making and selling its own vehicles to commercial operators.** The company has so far announced a delivery vehicle, a pickup truck, and a van, all of which are

17

built on the same underlying technological platform. Canoo will focus even less on the idea of selling its electric van to consumers through a subscription model — the original pitch when the startup broke cover in 2018.

Aquila has previously spoken about focusing more on selling to fleet operators and small businesses as opposed to customers, though **it wasn't until Monday that he explained just how far he is willing to take that strategy shift. To wit, Canoo quietly uploaded a new investor presentation to its investor relations website on Monday that no longer mentions Hyundai.**

"We have so much demand for our three [vehicles], let's get all that work done, and then let's, you know, look at if there [are] partnerships," he said. Aquila explained he believes that this will make for a more sound business with less risk. When pressed on the startup's previous claims about this part of its business, Aquila—who invested $35 million into Canoo before the SPAC merger—pointed to its prior leadership. **Aquila said they were "a little more aggressive" than he would've been with some of their public statements, and that talk of potential partnerships was "presumptuous."**

**"You've got to be careful with statements you make. So, you know, again, I think it was a little premature," he said.**

While some of those executives are indeed now gone, like cofounder and former CEO Stefan Krause, others remain — though they weren't on Monday's call. At one point Aquila was asked directly if Krause's replacement, **Canoo cofounder Ulrich Kranz, was still CEO. Aquila confirmed he is,** though as *The Verge* first reported late last year, Kranz's contract was recently renegotiated and he was removed from the board of directors.

Aquila said he believes the refocused business will help "protect" the intellectual property Canoo has developed, and that the original deal with Hyundai didn't factor in the value of that IP. When one analyst asked if Aquila thinks Hyundai misappropriated any of Canoo's IP, Aquila said "well I'll leave it to you to make that decision."

46.     In response to this news, shares of Canoo fell $2.50 (or $21.2%) from a March 29, 2021 close of $11.80 per share to close at $9.30 per share on March 30, 2021, on heavy volume.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

47.     An analyst from Roth Capital Partners downgraded the Company to neutral from buy and slashed the price target to $12 from $30 citing the hard pivot in the Company's business model.

## ADDITIONAL *SCIENTER* ALLEGATIONS

48.     The Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants. The Individual Defendants were motivated to materially misrepresent the true nature of the Company's business, operations, and financial affairs to the public and regulators in order to keep the Company's share price artificially high.

## LOSS CAUSATION / ECONOMIC LOSS

49.     During the Class Period, as detailed herein, the Individual Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's common stock and warrant prices, and operated as a fraud or deceit on acquirers of the Company's common stock and warrants.  As detailed above, when the truth about the Company's financial situation was revealed, the Company's common stock and warrants declined as the prior artificial inflation came out of its common stock price.  That decline in Company's common stock and warrant prices was a direct result of the nature and extent of the fraud finally being revealed to investors and

19

the market.  The timing and magnitude of the common stock and warrant prices decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the fraudulent conduct.  The economic loss, i.e., damages, suffered by the Plaintiff and other Class members was a direct result of the fraudulent scheme to artificially inflate the Company's common stock and warrant prices and the subsequent significant decline in the value of the Company's common stock and warrants when the prior misrepresentations and other fraudulent conduct were revealed.

50.  At all times relevant, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members.  Those statements were materially false and misleading because they failed to disclose a true and accurate picture of Company's business, operations and financial condition, as alleged herein.  Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Company's common stock and warrant prices to be artificially inflated.  Plaintiff and other Class members purchased Company's common stock and warrant prices at those artificially inflated prices, causing them to suffer the damages complained of herein.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## **NO SAFE HARBOR**

51.    The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false and misleading statements pleaded in this complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false, misleading or omitted necessary information when they were made.

## **COUNT I**
### **Violations of Section 10(b) of the Exchange Act and**
### **Rule 10b-5 Promulgated Thereunder**
### **(Against All Defendants)**

52.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

53.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

54.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of these defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for the Company's securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's finances and business prospects.

55.    By virtue of their positions at the Company Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, these defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to these defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

56.     Information showing that the Defendants acted knowingly or with reckless disregard for the truth is within these Defendants' knowledge and control.  As the senior managers and/or directors of the Company, the Individual Defendants each had knowledge of the details of the Company's internal affairs.

57.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company.  As officers and/or directors of a publicly held company, Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of the Company's securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning the Company's business and financial condition which were concealed by these defendants, Plaintiff and the other members of the Class purchased or otherwise acquired the Company's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by these defendants, and were damaged thereby.

58.     During the Class Period, the Company's securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which these defendants

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of the Company's securities at prices artificially inflated by these defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of the Company's securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of the Company's securities declined upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

59.    By reason of the foregoing, the Individual Defendants knowingly or recklessly, directly or indirectly violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with their purchases of the Company's common stock and warrants during the Class Period.

60.    As a direct and proximate result of the Individual Defendants wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

61.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of income and expenses and false financial statements.

63.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

64.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company securities.

65. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

(a) Determining this action to be a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

(c) Awarding Plaintiff the fees and expenses incurred in this action including reasonable allowance of fees for Plaintiff's attorneys and experts;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder; and

(e)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 9, 2021

Respectfully submitted,

**POMERANTZ LLP**

By: *s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: 310-405-7190
jpafiti@pomlaw.com

**HOLZER & HOLZER, LLC**
Corey D. Holzer
(*pro hac vice application forthcoming*)
211 Perimeter Center Parkway, Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
| --- | --- | --- | --- |
| GOEV | 01/27/2021 | 7 | $15.37 |
| | 01/27/2021 | 32 | $15.30 |
| | 02/03/2021 | 11 | $16.40 |
| | 03/04/2021 | 50 | $11.44 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
| --- | --- | --- | --- |
| GOEV | | | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

None

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___1___ day of ___April___, 2021 in ___(redacted)___

                                               City              State

(Signature) X _____ *Jeff Tyler* _____

DocuSigned by:
B867809157C140C...

(Print Name) _____ Jeff Tyler _____

**Canoo Inc. f/k/a Hennessy Capital Acquisition Corp. IV (GOEV)**                    **Tyler, Jeff**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 1/27/2021 | 7 | $15.3700 |
| Purchase | 1/27/2021 | 32 | $15.3000 |
| Purchase | 2/3/2021 | 11 | $16.4000 |
| Purchase | 3/4/2021 | 50 | $11.4000 |